IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Fuentes-Fernandez & Company, PSC; <br><br> Plaintiff, <br><br> v. <br><br> Caballero & Castellanos, PL; Elias Castellanos. <br><br> Defendants. | CIVIL NO. 07-00846 (RL) <br><br> JURY TRIAL DEMANDED |

## SECOND AMENDED COMPLAINT

Plaintiff, Fuentes-Fernandez & Company, P.S.C., by and through its attorneys, Drinker, Biddle & Reath LLP, states:

### THE PARTIES

1. Plaintiff Fuentes-Fernandez & Company, P.S.C., (hereinafter "FFC") is a corporation duly organized and existing under the laws of the Commonwealth of Puerto Rico. FFC is a Certified Public Accountants and Consultants professional service corporation authorized to do business in the District of Columbia, where it has its principal office at 1001 Connecticut Ave., N.W., Suite 300, Washington, D.C., 20036 and telephone number (202) 861-1904.

2. Defendant Caballero & Castellanos, PL (hereinafter "C&C") is a corporation duly organized and existing under the laws of the State of Florida, with principal offices at 4649 Ponce de Leon Boulevard, Suite 404, Coral Gables, FL, 33146-2118 and telephone number (305) 662-7272.

3. Defendant Elias Castellanos ("Mr. Castellanos"), in his individual capacity, on information and belief, is a citizen and resident of Florida and resides at 13055 SW 21st Street, Miramar, FL, 33027. Mr. Castellanos is a Partner with C&C.

**JURISDICTION AND VENUE**

4. The controversy arises between citizens with diverse citizenship, and the amount in controversy exceeds $75,000.00, exclusive of costs and interest, and therefore this Honorable Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1).

5. Venue properly lies in this Court because a substantial part of the events giving rise to the present claim occurred in the District of Columbia, and because the controversy is between citizens and legal entities of different States. In the present case, the controversy is between citizens of the Commonwealth of Puerto Rico, the State of Florida and the District of Columbia. A Corporation is deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced. Most of the damages and claims resulting from this action ultimately occurred in the District of Columbia, thus complying with the provisions of 28 U.S.C. §1391(a)(2).

**FACTUAL BACKGROUND**

6. All preceding paragraphs are incorporated herein by reference.

7. The events giving rise to this litigation involve a contract for services in support of the Housing Authority of New Orleans ("HANO"). HANO is a quasi-government agency created under the laws of the State of Louisiana to administer housing for low-income persons and families in approximately ten communities in the City of New Orleans, Louisiana.

8. In January 2002, HANO was designated by the U.S. Department of Housing and Urban Development ("HUD") as a troubled agency and placed in Administrative Receivership. The Administrative Receiver was charged with the responsibility of transforming the entity's overall operations and performance and, as a result, HANO sought the assistance of outside consultants to assist in the management of its fiscal operations.

9. On information and belief, HANO entered into a short-term agreement with National Technologies Inc. ("NTI"), a full service management and technical consulting firm to the affordable housing industry to assist in the management of its fiscal operations. C&C became a subcontractor for prime contractor NTI and agreed to provide financial operations services for HANO (hereinafter the "NTI Procurement").

10. Mr. Castellanos and C&C knew that HANO was interested in securing a long-term contract to provide financial operations recovery services of programs and entities administered by HANO (the "Long-Term Procurement"). Mr. Castellanos and C&C sought to secure this Long-Term Procurement for C&C.

11. Mr. Castellanos and C&C knew that for C&C to be qualified under both the NTI Procurement and the Long-Term Procurement, they would need experienced, qualified auditors immediately and there would be no time to give employees expansive training. The Request for Proposal associated with the Long Term Procurement, RFP No. 06-742-06-07 (the "HANO RFP"), specifically stated that the winning contractor had to demonstrate the experience and qualifications to provide the services and a readiness to perform the services *immediately* upon execution of the contract.

12. On or about June 16, 2006, Mr. Castellanos, on behalf of C&C, contacted Joseph Fuentes and solicited the services of FFC as a subcontractor in support of C&C's subcontract to NTI and its bid for the Long-Term Procurement.

13. Specifically, Mr. Castellanos asked FFC to provide junior-level auditors who could analyze transactions, apply GAAP principles in recording balances, post transactions to the general ledger, and reconcile and post transactions from previous fiscal years.

14. Mr. Castellanos repeatedly stressed his urgent need for staffing within a week and repeatedly represented that in return for FFC providing the services of qualified individuals immediately, FFC would receive a multi-year subcontract under the Long Term Procurement.

15. In an email dated June 19, 2006, Mr. Castellanos solicited the services of FFC by asking Mr. Fuentes to send the resumes of three people as soon as possible to respond to HUD's questions. In return, Mr. Castellanos, assured Mr. Fuentes, "There will be a long term procurement that I will have that we can discuss because as promised, I will fit a number of FTEs for you under the contract for two or three years."

16. On June 20, 2006, Mr. Fuentes requested that the parties enter into negotiations regarding pay rates, per diem, expenses, etc. Mr. Castellanos responded by setting forth the basic financial terms that he would pay FFC, but in an effort to gain FFC's immediate cooperation, he again assured Mr. Fuentes, "my long term objective is to put together a 2 to 3 year contract and pull together a number of FTEs during the contract period for you[.]"

17. Relying on Mr. Castellanos's representations, FFC entered into a Subcontractor Agreement with Carlos Rivera and Orlando Rodriguez. Mr. Rivera and Mr. Rodriguez were then assigned to the C&C project and they were used by C&C to service its responsibilities to HANO.

4

18. In an email dated July 13, 2006, Mr. Castellanos informed Mr. Fuentes that he would be submitting a bid for the Long-Term Procurement the following week and felt confident of winning the bid because of the team he had assembled. This team already included FFC and Mr. Castellanos implied to Mr. Fuentes that after being awarded the contract he would need further assistance from FFC.

19. Further to these assurances, in an email dated July 16, 2006, Mr. Castellanos instructed FFC to complete a subcontractor Letter of Intent to be included in C&C's bid for the HANO RFP. In this email, Mr. Castellanos on behalf of C&C, set forth the basic contractual terms by which C&C agreed to be bound. These included:

 a. Contract Duration: August 28, 2006 through August 27, 2009.

 b. Dollar Value: $500,000 per year (for a total of $1.5 million)

 c. Description of the Work: Financial Recovery Services Support.

20. The Letter of Intent also made clear that FFC would be contracting with C&C as a Disadvantaged Business Enterprise (DBE) subcontractor and stated that FFC would "enter into a signed agreement with the Prime Contractor listed above [C&C] within (5) five days after receipt of a signed contract executed by the Housing Authority of New Orleans."

21. FFC accepted C&C's terms and Mr. Fuentes, on behalf of FFC, completed the Letter of Intent and returned a signed and notarized copy to Mr. Castellanos in his capacity as a representative for C&C. C&C included the Letter of Intent in its bid proposal to HANO, thereby representing to HANO that it would be bound by those terms upon being awarded the HANO contract.

22. On July 24, 2006, FFC entered into a Subcontractor Agreement with Jonathan Cruz, securing his long-term services for C&C for the Long-Term Procurement.

23. Shortly thereafter, C&C began to demonstrate an inability or unwillingness to pay FFC for its services.

24. For example, despite the parties having agreed upon "net 30" payment terms, C&C failed to timely pay FFC on its June invoice. In an email dated August 1, 2006, Mr. Castellanos was unable to tell FFC when it would be paid for these services. In anther email dated the same day, Mr. Castellanos informed Mr. Fuentes that, among other things, it was unlikely that certain expenses submitted for FFC employees in July would be approved because the per diem expense rate had been unilaterally and without prior notice reduced from $230 to $180.

25. By mid-August, C&C still had not paid FFC for services rendered in June. Mr. Fuentes began to express concern to Mr. Castellanos about the late payments, but Mr. Castellanos deflected Mr. Fuentes's concerns by stating in an August 16, 2006 email, "I do promise that I will not do anything to compromise your trust in me since I am looking forward to more opportunities over time."

26. FFC, in reliance on C&C's representations that it would be part of FFC's Long-Term Procurement continued to provide services.

27. C&C again failed to timely pay FFC for bills submitted in July. When a check was finally sent out in mid-September, the check was initially rejected by FFC's bank; this caused several of FFC's checks – some going toward continuing project expenses incurred by FFC's staff on the HANO engagement – to be rejected as well.

28. C&C also withheld payment to FFC for certain expenses until it could reach resolution on those expenses with NTI, despite the fact that those expenses were properly billed by FFC in accordance with the terms agreed to by FFC and C&C.

29. On September 15, 2006, Mr. Castellanos alerted FFC that C&C was awarded the HANO contract. He further informed FFC that he could begin bringing in new people and informed Mr. Fuentes that he would let Mr. Fuentes know how many people he would need because "I need people here very soon."

30. After learning that C&C had formally signed an agreement with HANO, Mr. Fuentes asked Mr. Castellanos via an email dated September 21 to make arrangements to have a formal copy of the subcontractor agreement signed on behalf of C&C. In a meeting on or about September 29, 2006, FFC and C&C agreed to the terms stated in the subcontractor agreement and the exhibits thereto. Mr. Fuentes, on behalf of FFC, presented Mr. Castellanos with a copy of the subcontractor agreement and the exhibits thereto and asked him to have C&C formalize a copy. In an email on September 29, 2006, Mr. Fuentes included a copy of the subcontractor agreement and the exhibits thereto and reiterated his request to have C&C return a signed copy of the subcontractor agreement. C&C never returned a signed copy to FFC, but allowed FFC to continue performing under the terms of the subcontractor agreement and the exhibits thereto.

31. Despite the imminent transition off of the NTI Procurement and onto the Long-Term Procurement, C&C's refusal to pay FFC in a timely manner continued and C&C again failed to timely pay FFC for bills submitted in August. By mid-October, C&C was significantly in arrears with payments to FFC.

32. C&C's repeated failure to pay FFC timely and in full placed a severe strain on the company's cash flow and its ability to pay its employees salaries and expenses in a timely manner.

33. C&C exploited FFC's difficult financial position by paying some expenses for FFC's employees directly, and by accepting directly from FFC employees their expense

reimbursement requests in lieu of formal salary and expense reimbursement requests directly from FFC. C&C then cited discrepancies between expense reimbursement requests solicited directly from the employees and those submitted by FFC as an excuse not to pay FFC in a complete and timely manner.

34. Nevertheless, based on the assurances by Mr. Castellanos and C&C that all payment matters would be resolved soon after C&C became the prime contractor, FFC continued to provide services to C&C.

35. On October 27, 2006, C&C formally moved from the NTI Procurement to the Long-Term Procurement whereby it became the prime contractor for financial operations recovery services.

36. Nevertheless, C&C again failed to timely pay FFC for bills submitted in September. FFC nevertheless continued to provide services.

37. In an email dated October 31, Mr. Fuentes again asked Mr. Castellanos to have C&C formalize a copy of the subcontractor agreement. C&C never returned a signed copy to FFC, but allowed FFC to continue performing under the terms of the agreement and the exhibits thereto.

38. In a November 9, 2006 email, Mr. Fuentes again asked Mr. Castellanos to sign and return the paper copy of the subcontractor agreement memorializing the terms of the agreement between C&C and FFC so that he could seek a larger credit line from his bank. Mr. Castellanos assured Mr. Fuentes that he would "get to it tonight[.]" C&C did not forward a copy of the finalized agreement.

39. In a November 28, 2006 email, Mr. Fuentes again asked Mr. Castellanos to sign and return the paper copy of the subcontractor agreement. C&C did not forward a copy of the finalized agreement.

40. Despite not receiving a formal, signed copy of the agreement, FFC continued to perform pursuant to its terms. C&C, knowing that FFC was performing pursuant to the terms detailed in the letter of intent and the subcontractor agreement and the exhibits thereto, continued to accept FFC's services without objection to any of the terms of their agreements.

41. C&C continued to assure FFC that it was working to resolve the issues related to payments, but nevertheless continued to issue payments to FFC that were delayed and incomplete, offering a variety of excuses. Among other reasons, C&C blamed HUD for the late payments, explaining that C&C could not pay FFC until it received payment from HUD.

42. On or about December 1, 2006, FFC still being under acute financial pressure because of bills that remained unpaid by C&C, Mr. Fuentes asked Juan Carlos Rivera, one the FFC employees assigned to work with C&C in HANO's Accounts Payables Office, whether HANO had paid invoices submitted November 27, 2006. Mr. Rivera assured Mr. Fuentes that HANO had in fact done so. Mr. Fuentes then contacted C&C to ask when he could expect payment. In response, Mr. Fuentes was told that HANO had not paid C&C. Mr. Fuentes explained that he knew C&C had been paid based on a conversation he had with his employee.

43. Immediately after the call – on the same day – C&C transferred Mr. Rivera out of the Accounts Payable Office to the General Accounting Office without explanation.

44. When Mr. Fuentes contacted Mr. Castallanos directly to inquire about the transfer, Mr. Castellanos offered no indication that Mr. Fuentes's communication with his employee was in any way objectionable.

9

45. However, on December 22, 2006, Mr. Castellanos announced that C&C was terminating its contract with FFC effective March 2, 2007, purportedly for "the breach of trust that [Mr. Fuentes] showed in dealing with me and C&C under this contract." Mr. Castellanos failed to indicate any actual, legitimate breach of contract on the part of FFC.

46. In an email dated January 12, 2007, Mr. Rodríguez, on behalf of himself and Mr. Rivera, notified FFC that they intended to terminate its contract with FFC and collect payment directly from C&C. On the same day, Mr. Fuentes replied, assuring Mr. Rodríguez that FFC would reimburse him and Mr. Rivera for any salary or expenses still owed to them. On January 15, 2007, Mr. Rodríguez replied and offered to give FFC thirty days to come up-to-date with all payments owed to them.

47. On January 26, 2007, Mr. Fuentes on behalf of FFC wrote to C&C, imploring the company to reconsider its improper termination of the contract and asking for a reply by February 2, 2007.

48. Even before the deadline for a reply, on February 1, 2007, Juan Carlos Rivera and Orlando Rodríguez notified Mr. Fuentes that they would terminate their contracts on either February 16 or March 2, 2007. Jonathan Cruz informed Mr. Fuentes that he would terminate his contract on March 2, 2007. As no proper termination of the prime contract had or would occur, these constituted improper repudiations of their agreements with FFC.

49. After repudiating their agreements with FFC, Juan Carlos Rivera, Orlando Rodríguez, and Jonathan Cruz were hired by C&C in the same capacity that they worked as subcontractors while employed by FFC.

## COUNT I

### Breach of Contract

50. Plaintiff incorporates by reference paragraphs 1 through 49.

51. C&C entered into a contract with FFC for financial operations recovery services. The terms of the agreement, by which the parties were performing for many months, were spelled out in the July 16, 2006 email that C&C sent to FFC, the Letter of Intent, and the subcontractor agreement and the exhibits thereto that FFC delivered to C&C for signature.

52. C&C willfully breached the terms of the contract by:

    a. Failing to consistently comply with its obligation to make payments within 30 days for the services rendered by FFC to C&C; and

    b. Unilaterally terminating the referred to contractual relationship without just cause.

53. Because of C&C's breach, FFC suffered and continues to suffer economic and monetary damages at an amount to be determined at trial, but no less than $800,000.

## COUNT II

### Tortious Interference with a Contractual Relationship

54. Plaintiff incorporates by reference paragraphs 1 through 53.

55. FFC had a valid and enforceable contract with each of its subcontracting audit staffers, including Juan Carlos Rivera, Orlando Rodríguez and Jonathan Cruz.

56. Mr. Castellanos and C&C knew of these contractual relationships.

57. Mr. Castellanos and C&C, by delaying payments to FFC, offering to pay directly the expenses of Juan Carlos Rivera, Orlando Rodríguez and Jonathan Cruz, informing them of

C&C's illegal breach of contract, and otherwise enticing them to breach their contract with FFC, maliciously, willfully and intentionally interfered with FFC's contracts with Juan Carlos Rivera, Orlando Rodríguez and Jonathan Cruz.

58.     As a result of that interference, FFC was deprived of the services of the subcontractors for this and other projects. Moreover, by inducing an improper breach on the part of Juan Carlos Rivera, Orlando Rodríguez and Jonathan Cruz, and hiring them directly, Mr. Castellanos and C&C assured themselves that they could breach their contract with FFC and suffer no adverse consequences as a result of losing these skilled employees.

59.     As a direct and proximate cause of Mr. Castellanos and C&C's intentional interference with FFC's contractual relationships, FFC has suffered economic and consequential damages at an amount to be determined at trial, said amount being greater than $75,000.

## COUNT III

### Promissory Estoppel

### (ALTERNATIVE CLAIM)

60.     Plaintiff incorporates by reference paragraphs 1 through 49.

61.     Mr. Castellanos, on behalf of C&C repeatedly promised FFC that C&C would enter into a three-year agreement employing FFC to meet its auditor staffing needs during the term of its contract with HANO.

62.     FFC reasonably relied to its detriment on the assurances of Mr. Castellanos and C&C and performed services for C&C on an expedited basis and without regard to delayed and incomplete payments, invested vast amounts of administrative time, laid out significant capital, and took out significant loans believing that it would reap the benefits of a long-term contract with C&C on the HANO contract.

63. As a result of its reliance on the assurances of Mr. Castellanos and C&C, FFC suffered economic and monetary damages at an amount to be determined at trial, said amount being greater than $75,000.

64. Enforcement of Mr. Castellanos and C&C's promises would be in the public interest and prevent injustice.

## COUNT IV

### Quantum Meruit

### (ALTERNATIVE)

65. Plaintiff incorporates by reference paragraphs 1 through 49.

66. By finding, hiring, and preparing audit employees for the HANO project, FFC performed valuable services for C&C. C&C, accepted, used and enjoyed and continues to use and enjoy the benefits of FFC's services.

67. The nature of the agreement between the parties put C&C on reasonable notice that FFC expected to be paid by C&C for its services. Nevertheless, FFC was not fully compensated for finding, hiring, and preparing the audit employees that C&C continues to employ.

68. For the services rendered, FFC is entitled to an amount to be determined at trial, said amount being no less than $180,000.

## COUNT V

### Fraudulent Misrepresentation

### (ALTERNATIVE)

69. Plaintiff incorporates by reference paragraphs 1 through 49.

70. Mr. Castellanos, on behalf of C&C repeatedly represented to FFC that C&C would employ FFC to meet its auditor staffing needs during the term of its contract with HANO if FFC would provide qualified auditors to meet its immediate needs. The representations are included in paragraphs 15, 16, 18, 19, 25, and 29.

71. Mr. Castellanos, on behalf of C&C, knew that these statements were false when he made them and did not intend for C&C to employ FFC for the entire term of the contract. To the contrary, C&C intended, once the HANO contract was secured and it had adequate personnel to meet its needs under that contract, to terminate FFC's services and retain the labor FFC provided without having to compensate FFC.

72. Mr. Castellanos, on behalf of C&C, also knowingly and intentionally led FFC to believe that FFC was performing pursuant to the terms of the subcontractor agreement and the exhibits thereto by refusing to object (despite a duty to do so) when FFC repeatedly sent Mr. Castellanos a copy of this document for his signature, as stated in paragraphs 30, 37, 38, 39, and 40. Pursuant to this agreement and the exhibits thereto, FFC expected that it would be employed for the entire term of the HANO contract, until August 28, 2009.

73. Mr. Castellanos and C&C intended for FFC to rely on their assurances as well as their silence so that FFC would not withdraw its employees, would continue to outlay funds for the project, and would continue to serve as a qualified Disadvantaged Business Enterprise to better C&C's chances of securing the Long-Term Procurement from HANO.

74. FFC justifiably relied on the assurances of Mr. Castellanos and C&C and as a result continued to provide qualified employees that it had vetted and prepared to C&C, signed on as a Disadvantaged Business Enterprise subcontractor to better C&C's chances of receiving the HANO contract, and laid out significant expenditures and took out significant loans in

support of the project believing that it would reap the benefits of a long-term contract with C&C on the HANO contract.

75.   Mr. Castellanos, and through him, C&C, knew that the affirmative representations described above were false when made and were made with the intention of deceiving FFC. Mr. Castellanos, and through him, C&C, also knew that the silent representations described above created a false impression on FFC and were made with the intention of deceiving FFC. Mr. Castellanos, and through him, C&C, made all of these representations (affirmative and silent) fully intending to induce FFC to rely on these misrepresentations.

76.   As a result of its reliance on the affirmative and silent representations of Mr. Castellanos and C&C, FFC suffered damages, including lost business, interest and penalties at an amount to be determined at trial, said amount being no less than $800,000.

## PRAYER FOR RELIEF

Plaintiff prays that relief be entered against Defendants and in favor of Plaintiff as follows:

1.   Compensatory and punitive damages in an amount appropriate to the proof at trial;

2.   The costs of this suit, including reasonable attorneys' fees;

3.   Such other and further relief as this Court deems necessary or appropriate in the interests of justice.

Respectfully submitted,

By: _____
Michael J. McManus (D.C. Bar No. 263832)
Joaquin A. Marquez (D.C. Bar No. 158691)
DRINKER BIDDLE & REATH LLP
1500 K Street, N.W., Suite 1100
Washington, D.C. 20005-1209
Telephone:   202-842-8800
Fax:              202-842-8465
Email:           Michael.McManus@dbr.com
                    Joaquin.Marquez@dbr.com
*Attorneys for Fuentes-Fernandez & Company, PSC*

Dated:  February 15, 2008

## REQUEST FOR JURY TRIAL

Plaintiff requests a trial by jury of all issues raised in this Second Amended Complaint.

Respectfully submitted,

By: /s/ Michael J. McManus
Michael J. McManus (D.C. Bar No. 263832)
Joaquin A. Marquez (D.C. Bar No. 158691)
DRINKER BIDDLE & REATH LLP
1500 K Street, N.W., Suite 1100
Washington, D.C. 20005-1209
Telephone:   202-842-8800
Fax:              202-842-8465
Email:           Michael.McManus@dbr.com
                    Joaquin.Marquez@dbr.com

*Attorneys for Fuentes-Fernandez & Company, PSC*

Dated: February 15, 2008

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Second Amended Complaint was served by first class mail, postage prepaid, on this 15th day of February, 2008, on the following:

Gerald Antonio Rovelo
915 Brockenbraugh Court
Metairie, LA 70005-1603

*Counsel for Defendant Caballero & Castellanos, PL., Orlando Rodriguez, Jonathan Cruz, and Juana Rivera.*

_____
Mark H. M. Sosnowsky